# GOO KIM FOOK ET AL., COPARTNERS DOING BUSINESS UNDER THE FIRM NAME AND STYLE OF KONG SANG YUEN COMPANY, *v.* HEE FAT AND TOMG SHEE HEE FAT.

## No. 1422.

APPEAL FROM CIRCUIT JUDGE FIRST CIRCUIT.
HON. J. J. BANKS, JUDGE.

SUBMITTED JUNE 24, 1923.                    DECIDED OCTOBER 3, 1923.

PETERS, C. J., PERRY AND LINDSAY, JJ.

MORTGAGES—*foreclosure.*
    The trial court failed to find the facts and dismissed the bill.
    Held, upon the evidence plaintiffs were entitled to foreclosure.
EVIDENCE—*expert—handwriting.*
    Teachers of Chinese penmanship in Chinese schools of advanced standing are qualified to compare Chinese writings and give their opinion as to whether such writings are the product of the same or. different persons.

OPINION OF THE COURT BY PETERS, C. J.

This is a suit in equity for the foreclosure of a mortgage. The mortgage is dated June 9, 1910, and was given to secure a six months' note of even date for $4000 with interest at nine per cent. per annum. The note is signed by Hee Fat and payable to the Kong Sang Yuen Company or order. Tomg Shee Hee Fat joined with her husband Hee Fat in executing the mortgage by way of a release of her right of dower in the land subject thereto. The ground of foreclosure was the breach by the mortgagor of the condition of the mortgage in respect to payment of principal and interest secured. The answer alleged that the mortgage had been paid in not less than one year after its date and if the sum of $793.72 had been paid by the respondents as alleged it was for other reasons and upon other matters.

Upon the trial the execution of the note and mortgage was admitted by respondents. In support of their defense of payment respondents produced an account sales rendered by the complainants and dated August 31, 1910, over the signature of the copartnership Kong Sang Yuen Company and purporting to be in the handwriting of its manager, one Goo Kim Fook, wherein was recited that of a credit balance of $4240.74 due the respondent Hee Fat from the net proceeds of the sale of rice consigned by the latter to the copartnership the sum of $4082 had been applied by the consignee as mortgagee to the payment of the mortgage, principal and interest, which the respondents claim fully paid and discharged the mortgage in question. The complainants rejoined that the document referred to was a mere statement of account sales of five different consignments of rice during the months of May and June 1910, showing the net proceeds of the sale thereof and that that portion thereof purporting to evidence the application by them of the sum of $4082 to the payment of the mortgage was fraudulently inserted by some one other than the author of the account after it had been rendered by the partnership and delivered to the respondent Hee Fat; that the net balance of the proceeds of the sale of rice, as reported by the account sales, had been applied by them upon an indebtedness then existing upon open account from Hee Fat to the copartnership for money loaned and advanced to and on behalf of Hee Fat and that the mortgage was wholly due and unpaid except for and to the extent of the sum of $793.72 paid by the respondents on March 31, 1916, as alleged.

Upon the conclusion of the trial the trial judge in an oral opinion declared that he was in doubt on the question of alteration; that he could not find for or against the document; that the burden of proving a material alteration rested upon the complainants and they having failed

to satisfy the court's mind upon that question by a preponderance of the evidence were not entitled to foreclosure and accordingly dismissed the bill.

A decree accordingly was entered in favor of the respondents and against the complainants dismissing the bill.

The complainants prosecuted this appeal.

An examination of the record in this case renders it unnecessary to determine upon whom rested the burden of proving that the account sales of August 31, 1910, was altered after delivery to the defendants. The evidence is overwhelming that the account sales of August 31, 1910, did not contain the disputed portion at the time it was rendered and delivered by the plaintiffs to the defendant Hee Fat, and were the burden of proving that fact upon the plaintiffs they have successfully sustained that burden.

It is undisputed that the complainants are the surviving partners of the general copartnership of Kong Sang Yuen Company; that on June 9, 1910, in consideration of the sum of $4000 loaned and advanced to him by the then copartners of the Kong Sang Yuen Company, Hee Fat executed and delivered to the copartnership his promissory note in that amount payable to the copartnership or order six months after date with interest at the rate of nine per cent. per annum; that to secure the payment of the principal and interest of said note and as part of the same transaction Hee Fat and his wife, Tomg Shee Hee Fat (the latter joining therein by way of release of dower) conveyed to the copartnership by way of mortgage certain lands at Kapaa, Kauai, more particularly described therein; that complainants are the owners and holders of the said mortgage and that it is this mortgage that the complainants by this action seek to foreclose.

Both parties are Chinese.

It appears from the evidence that the complainants

were merchants in Honolulu and the respondent Hee Fat a rice-planter at Kapaa, Kauai, and that from February 1907 to September 1916, when the copartnership retired from active business and existed in name only for the purpose of winding up its affairs, they did business with each other, the copartnership selling Hee Fat merchandise and the latter consigning rice grown by him to the company for sale upon commission, against which he was allowed by. the company certain advances and which, including debits for application to the merchandise account, sometimes balanced but more often exceeded the net proceeds of the sales of rice. From the books of account of the company it appears that upon quarterly accountings when the proceeds of sales of rice were in excess of cash advances the surplus was invariably applied to Hee Fat's indebtedness upon his merchandise account. The copartnership kept complete books of account in Chinese; its transactions with the respondent Hee Fat being preserved in three different books, one containing his merchandise account, another his rice consignment account and the other cash advances, sometimes referred to as the open account. This cash account included not alone cash advanced directly to Hee Fat but also cash advanced to others at his instance and request. The indebtedness upon this cash account was not secured and interest was charged thereon by the partnership at the rate of nine per cent. per annum. Of these transactions the partnership, according to the evidence of Goo Kim Fook, rendered accounts accordingly to Hee Fat. Whenever a sufficient quantity of rice had been disposed of, an account sales was rendered showing the quantities and qualities of each shipment, the day on which and the steamer by which received, the selling price per bag and gross proceeds of each shipment, the freight and cartage paid thereon, commissions charged and finally the net credit balance. The

net credit balances of all account sales were consolidated in a current quarterly account as of March 31, June 30, September 30 and December 31 each year with the statement of all the advances made by the firm during the period and what application, if any, had been made by the copartnership upon Hee Fat's merchandise account. Bills for merchandise were rendered separately. All these accounts were in Chinese. Hee Fat denied receiving these quarterly accounts and stated that what account sales he had received were only received by him some months after the sales were made and that some sales were not accounted for at all. According to the books of the partnership during the years 1907, 1908 and 1909, with the exception of the quarters ending September 30, in each of those years, the proceeds of sales of rice consigned by Hee Fat to the copartnership were sufficient to meet all advances made to him and leave an excess credit which was applied by the former to Hee Fat's indebtedness on his merchandise account. But in the succeeding years and to and including March 31, 1912, he was overdrawn every quarter. The dates and the amounts of the respective overdrafts were as follows: 1910: March 31, $3986.73; June 30, $4841.99; September 30, $3413.06; December 31, $6094.11; 1911: March 31, $3200.39; June 30, $2248.87; September 30, $4225.90; December 31, $4034.18; 1912: March 31, $1843.21. Upon and after June 30, 1912, and up to March 31, 1916, Hee Fat's rice consignments seem to have been sufficient to balance the cash advances made him and allow a substantial excess to be applied on his merchandise account. These figures were not disputed by Hee Fat. The record does not disclose the state of his merchandise account during any of the period referred to except that Goo Kim Fook testified that in March 1916, when Hee Fat was not indebted to the copartnership for cash advances, he was indebted to

the former in excess of $15,000. According to the account alleged to have been rendered by the copartnership on December 31, 1916, Hee Fat was indebted for merchandise in the sum of $16,735.59. Whether, however, this was a recent or gradual accumulation does not appear. The character of the merchandise account and the volume thereof may be appreciated by the several applications made by the partnership from the proceeds of the sale of rice shown by the books of the company. In 1907 it applied upon Hee Fat's merchandise account $3102.78; in 1908, $6323.13; in 1909, $5822.97; in 1910, $1500; in 1911, $9976.82; in 1912, $9001.33; in 1913, $5737.22; in 1914, $6194.86; in 1915, $2267.60 and in 1916, $702.17.

Hee Fat's rice consignments were considerable, the annual net proceeds from sales thereof being as follows: 1907, $33,863; 1908, $33,271.40; 1909, $35,132.47; 1910, $20,835.12; 1911, $23,321.07; 1912, $30,001.38; 1913, $19,869.26; 1914, $10,924.58; 1915, $3972.60; 1916, $1770.89, totaling for the period $212,961.77. Subtracting therefrom the total amount of $50,628.88 applied to the payment of merchandise, the balance of $162,332.89 would represent cash advances.

The books of the company disclose no credit on account of the mortgage except the sum of $793.72 hereinbefore referred to, which was the entire balance remaining to the credit of Hee Fat on account of sales of rice on March 31, 1916, when apparently the parties discontinued active business with each other. Goo Kim Fook testified that this application was made by him with the previously expressed direction and approval of Hee Fat and that although the latter was present when Goo Kim Fook charged this amount to Hee Fat's rice account and credited it upon the mortgage note, he (Goo Kim Fook) subsequently mailed to Hee Fat a receipt therefor as well as a quarterly account containing this item as a debit against

the proceeds of the sale of rice during that quarter. In all of this Goo Kim Fook was corroborated by a former employee of the company. Hee Fat denied it in toto. This credit of $793.72 also appears in the alleged account of December 31, 1916. The item of $4082, which the respondents claim was applied by the copartnership to the mortgage indebtedness, according to the account sales of August 31, 1910, does not appear in the company's books. On the contrary the books not only fail to disclose any application upon the mortgage indebtedness prior to March 31, 1916, but show that Hee Fat was credited upon his open account on August 31, 1910, with the sum of $4242.72, the net proceeds of rice to which Hee Fat was entitled on that date, and that after such application, Hee Fat was overdrawn on August 31, 1910, in the sum of $8048.24, and at the end of the current quarter (September 30, 1910,) in the sum of $3413.06. If the sum of $4082 had been applied to the mortgage indebtedness on either of those dates Hee Fat's respective overdrafts would have been increased by that amount.

The account sales of August 31, 1910, upon which the respondents predicated their claim of payment, after reciting the details of the gross receipts and deductions, concludes:

"Balance ought to be credited on acct. of
   rice ..............................$ 4242.72
"This money is applied in payment of mort-
   gage, principal and interest........... 4082.00

"Net balance .........................$ 160.72
"Accordingly this amount is this day credit-
   ed to cash balance on open account."
   (Stamp reading) "Settled."
"To Mr. Hee Fat.
"August 31st, 1910." (Stamp reading) "Honolulu, Kwong
   Sang Yuen" "Statement."

The statement beginning with the words "This money" and ending with the figures "$160.72" is the portion of the account which Goo Kim Fook claimed was not in his handwriting.

Without the disputed writing the conclusion of the account would read as follows:

"Balance ought to be credited on acct. of
    rice .............................$ 4242.72

"Accordingly, this amount is this day credit-
    ed to cash balance on open account."

    (Stamp reading)  "Settled."

"To Mr. Hee Fat.

"August 31st, 1910."  (Stamp reading)  "Honolulu, Kwong Sang Yuen" "Statement."

Two similar accounts sales dated March 31, 1910, and June 23, 1910, which were admitted in evidence, uniformly conclude:

"Amount ought to be credited on account of rice"
    (stating the net amount).

"Accordingly this amount is this day credited to cash
    balance on open account."  (Stamp reading)
    "Settled."

"To Mr. Hee Fat.

"August 31st, 1910."  (Stamp reading) "Honolulu, Kwong Sang Yuen" "Statement."

The accounts sales being in Chinese, the manuscript, according to the system employed in writing that language, runs lineally from the top to the bottom of the written page beginning on the extreme right and proceeding to the left. Hence what has been quoted horizontally in English appears vertically in the Chinese characters. In all the accounts sales referred to the writing seems to have been so arranged that the body of the statement concluding with the words "balance ought to be credited on account of rice" followed by the amount of net proceeds, ends at the bottom of a line. In each account sales the statement "Accordingly, this amount is this day credited

to cash balance on open account" (Stamp reading) "Settled," begins half way down on the next line and ends at the bottom of the line.  The address, date and stamp reading "Honolulu, Kwong Sang Yuen" "Statement" are on the next line to the left, the address and date above, followed by a space and the stamp for the signature and the word "Settled," complete the line.  The disputed writing in the account sales of August 31, 1910, which, translated, is "This money is applied in payment of mortgage, principal and interest, $4082, net balance $160.72," is above and on the same line as the characters meaning "Accordingly, this amount is this day credited to cash balance on open account" (Stamp reading) "Settled," and between the concluding line of the body of the account on the right and the address and date on the left.

Both parties submitted evidence upon the authenticity of the disputed portion of the account.  This account sales of August 31, 1910, is the only direct evidence of payment. Corroboration was had in the evidence of Hee Fat's books, where the application of $4082 upon the mortgage indebtedness was entered, identified by Hee Fat's former bookkeeper and the evidence of Hee Fat and his wife, to the effect that after the alleged application in August 1910, that is, some time in September 1910, Mrs. Hee Fat, and later Hee Fat personally, requested Goo Kim Fook to return the mortgage and that while the latter admitted payment he never complied with their request.  On the other hand the complainants offered evidence tending to show that Hee Fat, subsequent to the payment of the mortgage, acknowledged it as a subsisting indebtedness and upon numerous occasions when importuned for the payment thereof renewed his promises of payment.

The question then is whether the account sales of August 31, 1910, was altered after its rendition by complainants by the fraudulent insertion of the alleged item

applying $4082 upon the principal and interest of the mortgage debt and leaving $160.72 to be applied on the open account. This is to be decided upon the evidence of the witnesses on handwriting and the acts of the parties subsequent to the alleged payment accordingly as they are consistent or inconsistent with the existence or extinguishment of the mortgage debt, strengthened or weakened accordingly as the record shows their evidence to be entitled to greater or less weight and credibility.

First as to the authenticity of the handwriting of the disputed portion of the account sales of August 31, 1922.

At the outset we are met by the preliminary question of whether the evidence given by some of the alleged experts on handwriting called by the respondents should be considered at all by the court. Both complainants and respondents called witnesses to make a comparison of the writings contained in the alleged receipt by comparison. The sole qualification was experience as teachers of Chinese writing. To some the preliminary objection was made that they failed to qualify as experts. This court has held in the case of *Hee Fat* v. *Wong Kwai*, 23 Haw. 328, 333, that a witness called on to testify merely from a comparison of handwritings must be first shown to be an expert and that it is error to permit one who is not qualified as such to testify as an expert. The word "expert" is a relative term and the question of qualification as such depends very much upon the subject of investigation. The writing being in Chinese inspection by the uninitiated reveals nothing. The court is deprived of examination by comparison which is usually available upon investigation of writings in English. The method of writing Chinese, differently from English, is unknown to the court. In order to compare English writings it is not necessary that one should have been in the situation where his duty required him to distinguish between gen-

uine and counterfeit handwriting. "When handwriting is a subject of controversy in judicial proceedings, witnesses who by study, occupation and habit have been skilful in marking and distinguishing the characteristics of handwriting, are allowed to compare that in question with other writings which are admitted or fully proved to have come from the party and to give opinions formed from such comparisons." *Sweetser* v. *Lowell,* 33 Me. 446, 450. There is no rule of law fixing the precise amount of experience or degree of skill necessary to constitute one an expert. "In proving handwriting in general there is no rule which requires any particular amount of skill in the witness. Any one who has the proper facilities and who can swear to a knowledge of the handwriting in question has always been admitted. There are undoubtedly questions presented at times which require greater skill than others but such cases stand on their own grounds. It is a matter of common experience that all persons who can write at all can attain some familiarity with the handwriting of others and we can find no test which would be at all practicable except that of leaving their skill and capacity to be determined by the jury who hear them examined." *Vinton* v. *Peck,* 14 Mich. 287, 292. We see no reason why the habits and peculiarities of a writer should not be developed from Chinese as well as English writing. Both parties in examining the experts proceeded upon the theory that individual characteristics of the writer were determined by the same standards as in English writing. At least they made no distinction and we see no reason for any. Under the circumstances a teacher of penmanship in Chinese is qualified to some extent at least to compare handwritings and give his opinion as to whether they are the product of the same or different persons. A teacher of English penmanship in the primary grades would perhaps be of no assistance to

the court in comparing English handwritings and hence could not qualify as an expert. But the court knows of its own knowledge that Chinese is a language exceedingly difficult to write and requires years of preparation to form the characters properly, and from the evidence it would appear that the teaching of Chinese penmanship is not confined to primary grades, similarly as in English schools, but continues through the more advanced and even secondary Chinese schools as well. Neither of the parties made any particular effort to show the character of the school in which the experts subject to objection had been or were teaching. While the objection to their qualifications was made it was not developed. But enough appears in the record to show that the schools in which the teachers were or had been employed were not primary schools as we understand the classification of schools in the United States but somewhat after the standard of grammar schools. In one instance a reference by one witness would seem to indicate that he was teaching in a high school. Hence we believe that the witnesses presented were qualified as experts. What weight, however, should be given to their evidence is another question. If the witness is qualified to testify as an expert his evidence should be admitted, the weight to be attached to it being a matter for the jury or the court to determine accordingly as the jury or the court is the judge of the facts.

Moreover, the question of the qualification of an expert is *prima facie* for the court to whom the same is presented. "Whether or not the qualification of a witness with respect to knowledge or special experience is sufficiently established is a matter resting largely in the discretion of the trial court whose determination is usually final and will not be disturbed by an appellate court except in extreme cases where it is manifest that the trial court has fallen into error or has abused its discretion and that

prejudice to the complaining party has resulted even though the appellate court might have decided differently if the question had been presented to it in the first instance." 22 C. J. 526, 527. See also *Kamahalo* v. *Coelho,* 24 Haw. 689.

There are certain features connected with the writing in dispute which in the light of the evidence of the experts called by complainants excite suspicion even in one unacquainted with Chinese. The disputed portion does not line up with the writing on the same line but slants to the right meeting the remainder of the line at an angle. The Chinese characters of which it is composed are smaller than the rest of the document. Moreover they appear to have been crowded in between the last line of the body of the account and the address and date to the left. This is particularly noticeable in the photographic enlargement of the account. That portion of the account containing the disputed writing is smeared with ink thus lessening the liability of detection of forgery by comparison of the color of ink, strength of stroke, etc. This discoloration occurred while in the possession of Hee Fat and although accidental, as testified to by him, the result is as effective as if designed. The accident is explained by its continued presence in Hee Fat's home where his children had access to it and spilled ink upon it, although Hee Fat admitted that he had a safe there and the account should have assumed proportions of importance, when, according to his evidence, Goo Kim Fook as early as September 1910 showed no inclination to return the mortgage, which act Hee Fat considered equivalent to release.

Moreover, the presence in the account sales of an application of any of the proceeds of sale is suspicious. The document in the form produced does not conform to the ordinary conception of an account sales. An account sales of chattels consigned for sale would not ordinarily

contain items indicating the application of the whole or any part of the net proceeds. Especially is this so where the consignor and consignee are parties to a mutual open account, statements of which including credits for net proceeds of sales of rice are rendered quarterly by the consignee. There is no doubt .in our minds that the copartnership rendered Hee Fat quarterly accounts as claimed by its manager, Goo Kim Fook.

The respondents called seven experts on Chinese handwriting—two teachers of Chinese penmanship; one teacher who had formerly been the editor of a Chinese newspaper and the editor of a Chinese newspaper who had formerly been a school-teacher; a storekeeper who had previously been a teacher; a bookkeeper with similar previous experience, and the professor of Chinese history and literature in the University of Hawaii who had previously been a supreme court judge in China and the Chinese consul at Manila. Outside of the college professor their evidence was contradictory, weak and unsatisfactory and although the professor declared that the disputed handwriting was "different" from the rest of the document his evidence was weakened by the showing that he had made prior contradictory statements to counsel for respondents. An attempt was made to impeach this witness but the evidence was rejected by the trial court. The instance is nevertheless considered by us in weighing this witness' evidence. None of these experts were familiar with Goo Kim Fook's handwriting—in fact had never seen him write and prior to being called as witnesses had never seen any of his handwriting. With the exception of the professor they contented themselves with simply affirming that the handwriting was all the same and had been written by the same person. They either denied the existence of the obvious subjects of suspicion above referred to, or if they admitted their existence attached no significance

thereto, and in connection with particular words such as "money," "thousand," "hundred," "principal" and "dollar," which appeared both in the disputed writing and elsewhere in the document or in other admitted handwritings of Goo Kim Fook, testified that from their appearance they were written by the same person.

Besides Goo Kim Fook himself, who denied that he wrote the disputed portion of the account sales of August 31, 1910, complainants called eight handwriting experts—four of whom were familiar with Goo Kim Fook's handwriting, that is, one of his partners, two bookkeepers, one of whom had had previous experience in teaching Chinese penmanship, and Goo Kim Fook's son. The other four witnesses were: two Chinese penmanship teachers, an editor of a Chinese newspaper who had formerly taught penmanship, a teller of a local bank who for over twenty years past had handled all the business of its local Chinese clients as well as its local and foreign Chinese correspondence, and the Chinese interpreter of the United States immigration station at Honolulu. The business of both the bank teller and the interpreter required the investigation and comparison of Chinese writings.

We are inclined to accord to these penmanship teachers called by the complainants, as far as their qualifications go, no greater weight than accorded those produced by the respondents but we are impressed by the evidence of those familiar with Goo Kim Fook's handwriting and that of the interpreter and bank teller. Goo Kim Fook's partner testified that Goo Kim Fook was not in the habit of getting out account sales in that form and pointed out wherein the word "hundred" differed in the disputed handwriting from elsewhere employed in the document. The bookkeepers pointed out wherein the words "thousand," "hundred" and "dollar" differed from similar words

occurring in the account sales and other writings admittedly in the handwriting of Goo Kim Fook. The interpreter condemned the disputed writing as a forgery intimating that the studied precision of the writing was the result of copying from a previously prepared assimilation of Goo Kim Fook's handwriting. The bank teller declared that the writing was palpably a forgery and that it should be obvious even to counsel, unfamiliar though they be with Chinese handwriting. The stilted, crowded and apparently squeezed-in appearance of the writing was commented on by all.

This evidence leads inevitably to the conclusion that the disputed writing is not that of Goo Kim Fook.

Moreover, the surrounding circumstances indicate that the disputed writing is a forgery. The copartnership books were accurately kept. The cash account correlated with the rice consignment account. No issue was taken with the correctness of these accounts. The volume of business and the mutual relations of the parties made accounting imperative. The accounts sales that were produced came from the custody of the respondents. Hee Fat not alone denied that he received any quarterly statements of account but failed to show that he made any attempt to secure any accounting. It is conceivable, but highly improbable, that Hee Fat was indifferent as to the state of his account with the copartnership. He testified that he did not know whether he was indebted to the copartnership or not when he applied for the mortgage loan. Such indifference and lack of knowledge are not consonant with ordinary business dealings of the character and volume involved here nor do they appear reasonable. Hee Fat testified that he kept books of his dealings with the copartnership. In the absence of the receipt of accounts or information personally given him we fail to see how he could secure the necessary data to keep accurate books of

account. All of the surrounding facts and circumstances indicate that the partnership regularly rendered quarterly accounts to Hee Fat and we so find. Moreover, the final account of December 31, 1916, was undoubtedly received by him.

By these quarterly accounts and the final account of December 31, 1916, consistent as they were with the books of the copartnership, Hee Fat was regularly advised of the state of his account and that the copartnership had not applied any of the net proceeds of the sale of rice upon the mortgage indebtedness prior to March 31, 1916, and that at the close of that year the only credit upon the mortgage was the sum of $793.72 applied on March 31 of that year. In the face of this advice, however, the record is silent as to any complaint made by Hee Fat to the failure of the partnership to render accounts consistent with an application of $4082 on August 31, 1910, or to the additional application of $793.72 on March 31, 1916, when as claimed by Hee Fat the mortgage had been previously on August 31, 1910, fully paid. In addition to this there is the evidence previously adverted to of Hee Fat's prior direction and approval of the application of March 31, 1916. That the copartnership should apply $4082 upon the secured loan when Hee Fat was at that time indebted to the firm in excess of $8000 on an open unsecured account, the effect of which would have been to wipe out the secured account and increase the unsecured account to over $12,000, is incredible to say the least.

That no application was made upon the mortgage debt is further borne out by the witness called by complainants to corroborate Goo Kim Fook's evidence that subsequent to August 31, 1910, he made repeated demands upon Hee Fat for the payment of the mortgage and the latter's reply thereto as late as June 1916, renewing his promises and assurances of payment, thereby acknowledging the exist-

ence of the mortgage debt. Similar admissions were made by Hee Fat to a mutual friend of the parties who was attempting to assist the copartnership in liquidating the Hee Fat indebtedness. Goo Kim Fook's son also testified that he had made demands upon Hee Fat for the payment of the mortgage debt and that to him similarly as to the others he promised to pay as soon as money was available. These admissions taken in connection with the partnership books, the condition of Hee Fat's accounts with the company at the time that the so-called application was made, the rendition and receipt of quarterly accounts and the final account of December 31, 1916, inevitably lead to the conclusion that no application on account of the mortgage was made prior to March 31, 1916, and then only in the amount admitted by the complainants and that the alleged application contained in the account sales of August 31, 1910, is a false and fraudulent addition made after execution pretending to evidence a fact that never existed.

Our conclusions upon the authenticity of the sales account of March 31, 1910, and the acknowledgment by Hee Fat of the mortgage after August 31, 1910, dispose of the alleged demands of Hee Fat and his wife for the return of the mortgage. Goo Kim Fook denied that such demands were ever made. The evidence demands a finding that no demand for the return of the mortgage as released was ever made by Hee Fat or his wife.

The law makes it unnecessary to pass upon the credibility of Hee Fat's books or rather the entry recording the application of $4082 on account of his mortgage. The entry was self-serving and incompetent. Entries in a debtor's books of account are incompetent to show payment.

Finding as we do that the debt secured by the mortgage sought to be foreclosed is wholly due and unpaid,

except for the payment on March 31; 1916, of the sum of $793.72 as alleged, and that the complainants have by competent and satisfactory evidence established the truth of all the material allegations of their bill of complaint, the decree appealed from is reversed and the cause remanded to the trial court with instructions to enter a decree for complainants as prayed.

*Watson & Lymer* and *Marguerite K. Ashford* for complainants.

*Thompson, Cathcart & Ulrich* for respondents.